FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2007 AUG 24  PM 3: 25

CLERK _M Jantte_
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| COMMISSIONED II LOVE, SAVANNAH STATE UNIVERSITY CHAPTER, a student organization at Savannah State University; LARINDA NORWOOD, individually and in her capacity as President of Commissioned II Love; and Satin Kinsey-Hicks, individually and in her capacity as Vice President of Commissioned II Love, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. CV407-36 |
| DR. EARL G. YARBROUGH, SR., in his official capacity as President of Savannah State University, CARLTON E. BROWN, individually, RANDY GUNTER, individually and in his official capacity as Vice President for Student Affairs; IRVIN CLARK, individually and in his official capacity as Assistant Vice President for Student Affairs; GARY OLIVER, individually and in his official capacity as Director for Student Programs & Organizations; and MARILYN STACEY SUGGS, individually and in her Capacity as a Hearings Officer, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## O R D E R

Before the Court is Defendants Earl G. Yarbrough, Sr., Carlton Brown, Randy Gunter, Irvin Clark, Gary Oliver, and Marilyn Stacy Suggs's "Pre-Answer Motion to Dismiss." (Doc. 10.) After careful

consideration and for the following reasons, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND[1]

Plaintiff Commissioned II Love ("C2L"), an unincorporated, faith-based, student organization at Savannah State University ("Savannah State" or "the University"), and Plaintiffs Larinda Norwood and Satin Kinsey-Hicks, two C2L student officers, brought this action pursuant to 42 U.S.C. § 1983. Plaintiffs allege that Defendants violated their First Amendment rights by suspending and ultimately expelling C2L from campus due to the religious practices of its members. Specifically, Plaintiffs allege that Defendants violated their rights to freedom of speech, free exercise of religion, and freedom to peaceably assemble, as well as their rights to expressive and intimate association.

In October of 2003, C2L was officially recognized and approved by the University's Office of Student Programs and Organizations. As a Christian organization, C2L has adopted the following mission statement: "To advance, encourage, and uplift the kingdom of God through love by ministering and reaching out to the student body and beyond. We will help lead others to Christ by being role models through our lifestyle." (Doc. 1 at 6.) In order to advance this mission, C2L engages in on-campus and off-campus activities,

---

[1] On a motion to dismiss, the facts must be viewed in the light most favorable to the plaintiff. St. Joseph's Hosp. Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 954 (11th Cir. 1986).

including bible studies, evangelistic outreaches, accountability groups, fellowship retreats, prayer gatherings, and "Process of Purity" classes.[2] Each semester, the group holds a weekend beach retreat to celebrate new C2L members. During the retreat, it is customary for the current members of C2L to wash the feet of the new members. Plaintiffs claim that this action is part of their sincerely held religious beliefs and practices.

On December 10, 2005, C2L held its Fall 2005 retreat on Tybee Island, Georgia. The retreat represented the end of that semester's Process of Purity. During the retreat, the existing C2L members washed the feet of the new members. Mr. Xavier Coombs, a student and then-member of C2L, participated in the event and washed the feet of new members at this retreat.

In March of 2006, Mr. Desi Campbell, a student at Savannah State, gathered 150 signatures for a petition to "either get C2L to stop harassing people or to be put off campus." (Doc. 1, Complaint at 9.) At the beginning of April, he filed a complaint with the Savannah State Police Department, alleging that C2L members engaged in "practices that are not unlike [that] of a cult," such as "baptisms" and "footwashings." (Doc. 1 at 10.) Mr. Coombs served

---

[2] The Process of Purity consists of weekly Bible studies taught by outside ministers and C2L leaders on various topics. Plaintiffs state that the goal of the Process of Purity is to teach students the basics of the Christian faith.

as a witness to the complaint. He alleges that C2L harassed him and told him that "he needs to be saved." (Doc. 1 at 11.)

On April 10, 2006, Defendant Irvin Clark, the Assistant Vice President for Student Affairs at the University, issued a "Preliminary Conference Summons" to Plaintiff Norwood, the student President of C2L, charging the organization with Level I.1 Zero Tolerance Misconduct (Assault, Harassment & Fighting) and Level I.2 Zero Tolerance Misconduct (Hazing) under the University's Code of Student Ethics. The Summons also stated that all C2L activities were temporality suspended until the preliminary hearing and investigations were complete.[3]

Ten days after the imposition of the temporary suspension, approximately fifteen C2L members gathered together to pray on campus. In response, Defendant Randy Gunter, the Vice President for Student Affairs, ordered the University Police to stop the assembly.

On April 25, 2005, Savannah State held a hearing on the merits of Mr. Campbell and Mr. Coombs's allegations of harassment. The hearing officer, Defendant Marilyn Suggs, a faculty member, permitted the Complainants to testify and allowed Plaintiff Norwood to present witness testimony and other evidence on C2L's behalf.

---

[3] Suspension is one of the highest sanctions available under the Student Code of Ethics.

4

Defendant Suggs issued her final report on May 1, 2007. Therein, she found that several incidents involving C2L were a "cause of concern."[4] Due to these incidents, Defendant Suggs recommended to Vice President Gunter that C2L be suspended from campus until January 2007.[5] She also provided that C2L would remain on probation through Spring of 2008. Id. On May 8, 2006, C2L appealed the decision to Vice President Gunter.

On September 8, 2006, members and nonmembers of C2L planned to leave on a weekend trip to Orlando, Florida to attend a contemporary Christian music event at Walt Disney World. On the day of departure, Assistant Vice President Clark contacted Plaintiff Norwood and instructed her to cancel the trip due to C2L's suspension. Plaintiff Norwood refused to cancel the trip, contending that it was an off-campus event that was not affiliated with the C2L student chapter.

On September 11, 2006, Defendant Clark issued an "Organization Expulsion Notification" which immediately and permanently expelled C2L for violating its suspension.[6] (Doc. 1 at 16.) C2L appealed

---

[4] These incidents included the washing of feet and swimming in the ocean as alleged by Mr. Coombs. (Doc. 1 at 15.)

[5] The proposed suspension would prohibit C2L from: (1) conducting any activities; (2) congregating; (3) wearing its paraphernalia; (4) soliciting membership; or (5) participating in "meetings, step shows, or other 'underground activities' on campus or off campus...."

[6] Defendants contend that this expulsion notice was also issued, in part, after Defendants recieved a complaint from a student who

this decision, claiming, among other things, that the suspension and expulsion violated members' civil and constitutional rights. At an appeal hearing on September 28, 2006, Vice President Gunter denied all grounds for appeal without addressing Plaintiffs' allegations that the University's actions had violated their constitutional rights.

Two weeks later, C2L appealed Vice President Gunter's decision to Defendant Carlton Brown, the then-President of Savannah State. President Brown issued a decision on December 18, 2006, affirming the expulsion of C2L.  On May 30, 2007, Defendant Earl Yarbrough, Sr. became the President of Savannah State and is now in charge of administering and enforcing University policy, including C2L's expulsion.[7]

On March 3, 2007, Plaintiffs filed a Complaint against Defendants in the United States District Court for the Southern District of Georgia seeking a declaration that Defendants' actions violated Plaintiffs' First Amendment rights to free exercise of religion, free speech, freedom of association, and freedom of intimate association.  Among other things, Plaintiffs seek an injunction preventing Defendants from denying C2L student

---

alleged that members of C2L were questioning students who signed a petition in opposition to the group.  (Doc. 11 at 6.)

[7] Plaintiffs initially named Interim President Julian Scott, Jr. in their Complaint.  However, on August 16, 2007, Magistrate Judge Smith granted Plaintiffs' Motion to substitute the newly installed President Yarborough in Mr. Scott's stead.

organization status, as well as nominal damages. Defendants filed a Motion to Dismiss on March 27, 2007 under Federal Rule of Civil Procedure 12(b)(6).

**ANALYSIS**

I.    Motion to Dismiss Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court presumes the truth of all factual allegations in the plaintiff's complaint. See Crayton v. Callahan, 120 F.3d 1217, 1220 (11th Cir. 1990); see also Beck v. Deloitte & Touche, 144 F.3d 732, 735 (11th Cir. 1998) ("In evaluating the sufficiency of a complaint, a court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff."). The Court must construe the plaintiff's allegations liberally because the issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support the claims. See Davis v. Monroe County Bd. of Educ., 120 F.3d 1390, 1393 (11th Cir. 1997). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

II.  Standing

A.  Plaintiffs Norwood and Kinsey-Hicks's Individual Claims

The first issue is whether Plaintiffs Norwood and Kinsey-Hicks have standing to assert claims on behalf of themselves and C2L. Article III of the United States Constitution limits the judicial power of the federal courts to the resolution of cases or controversies. U.S. CONST. art III, § 2, cl. 1.  In order to satisfy the case or controversy requirement, Plaintiffs must demonstrate that they have "standing" to sue.  They must show that: 1) they have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to conduct of the defendant; and, 3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision.  Lugan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351, (1992).  The United States Supreme Court has held that standing may be predicated on noneconomic injury.  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 486, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982)).

Defendants argue that neither Plaintiffs Norwood nor Kinsey-Hicks have suffered an injury in fact.  Specifically, they contend that the injuries alleged by these Plaintiffs were sustained by C2L, not by these individual Plaintiffs.  Plaintiffs counter that

they have each alleged injuries that are concrete and particularized.

With regard to Plaintiff Kinsey-Hicks, the Complaint states that:

> On or about April 20, 2006, approximately fifteen C2L members, including Plaintiff Kinsey-Hicks, gathered to walk and pray together on campus. Defendant Gunter instructed the SSU Police to stop C2L from assembling and praying together. SSU Police Officers Lucious Simmons and Ebony Glover confronted the group and ordered them to stop praying and assembling because of their affiliation with C2L.

(Doc. 1 at 13-14.) Plaintiff Kinsey-Hicks contends that she suffered injury during this incident because she was prevented from praying and assembling with other students of her faith. This contention is a misstatement of the pleadings. Defendants allegedly prohibited C2L, as a student organization, from meeting and praying. Plaintiff Kinsey-Hicks and the other members were theoretically free to assemble and pray if they wished to do so. The pleadings offer no other information about injury to Plaintiff Kinsey-Hicks. Consequently, the Court finds that Plaintiff Kinsey-Hicks does not have individual standing to assert claims against Defendants. Defendants' Motion to Dismiss is, therefore, **GRANTED** with regard to Plaintiff Kinsey-Hicks's individual claims.

Plaintiff Norwood, however, has individual standing to bring this action. As laid out in the Complaint,

> On or about September 8, 2006, members of C2L as well as non-members took a weekend trip to Orlando, Florida to partake in Walt Disney's Night of Joy contemporary

> Christian music event at which prayer, worship, and singing of religious music were going to take place.
>
> . . .
>
> On the day the group was scheduled to depart, Defendant Clark contacted Ms. Norwood by phone and instructed her to immediately cancel the trip because of the suspension. Ms. Norwood informed Defendant Clark she would not cancel the trip because it was an off-campus event not affiliated with the C2L student chapter and was thus not subject to the suspension.
>
> . . .
>
> On or about September 11, 2006, Defendant Clark issued an "Organization Expulsion Notification" ("Expulsion") to C2L, via hand delivery, which immediately expelled and deactivated C2L permanently from SSU on the grounds that it had violated the terms of its suspension.

(Id. at 16.) Although Assistant Vice-President Clark's actions were initially directed toward C2L as a student group, he proceeded to suspend the group for actions that Plaintiff Norwood and the other students were allegedly engaging in as individuals. Accordingly, the Court finds that Plaintiff Norwood has alleged facts sufficient to state an individual claim against Defendants. Defendants' motion to dismiss is, therefore, **DENIED** with regard to Plaintiff Norwood's individual claims.

   B.   Plaintiffs Norwood and Kinsey-Hicks's Claims on Behalf of Plaintiff C2L

Defendants also argue that Plaintiffs Norwood and Kinsey-Hicks do not have standing to bring claims on behalf of C2L in their official capacities as President and Vice President of the Savannah State University Chapter of C2L. While the requirements for injury, causation, and redressability mentioned above are deemed to be constitutional limits on standing, the Supreme Court has also

10

articulated prudential standing barriers. One such nonconstitutional prudential limitation is the prohibition against third-party standing. "Even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, the Supreme Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 522 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); see also United Food and Commercial Workers v. Brown Group, 517 U.S. 544, 557, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996). In other words, a plaintiff cannot present the claims of third parties who are not part of the lawsuit. This prohibition promotes the fundamental purpose of the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly. See Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220-21, 94 S. Ct. 2925, 2932, 41 L. Ed. 2d 706 (1974).

The Eleventh Circuit has recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: the litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own

interests. <u>Harris v. Evans</u>, 20 F.3d 1118, 1122 (11th Cir. 1994). In the instant case, Plaintiffs Norwood and Kinsey-Hicks have not shown any hindrance to C2L's ability to protect its own interests. Accordingly, the Court finds that they do not have third-party standing to bring claims on behalf of C2L. Defendants' Motion to Dismiss Plaintiffs Norwood and Kinsey-Hicks's claims in their official capacities as President and Vice President of C2L is **GRANTED** and these claims are, therefore, **DISMISSED**.

III. <u>The Reasons for C2L's Suspension and Expulsion</u>

Next, Defendants argue that the pleadings establish that C2L's suspension and expulsion were based upon non-religious reasons. Specifically, they maintain that the documents provided by Plaintiffs show that the sanctions were based on safety concerns, campus rule infractions, and C2L's failure to abide by the suspensions. Plaintiffs counter that these arguments merely dispute Plaintiffs' factual allegations.

The Court agrees with Plaintiffs. Although Plaintiffs admit that Defendants claim to have suspended them for hazing, harassment, and violations of sanctions imposed by the university, the Complaint alleges that these reasons were a pretext for religious animus. To grant Defendants' motion at this juncture would require the Court to resolve issues of fact. Accordingly, Defendants' Motion to Dismiss based on the reasons for suspension and expulsion is **DENIED**.

IV.  The Claims

A.  The Right to Assemble

Defendants also argue that C2L's expulsion from campus only restricts them from assembling on campus as a student organization. They maintain that C2L has not shown that they would be prevented from assembling on campus as an outside organization. However, the denial of official recognition of a student group can establish a claim for restriction of associational rights. Healy v. James, 408 U.S. 169, 189, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972)("The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes.")  Moreover, the Supreme Court has stated that a student group's ability to exist outside the campus community does not significantly ameliorate the harm caused by the denial of official campus recognition.  See id. at 183. Accordingly, Defendants' Motion to Dismiss Plaintiffs' assembly claims is **DENIED**.

B.  Freedom of Intimate Association

Next, Defendants argue that C2L has failed to assert a valid freedom of intimate association claim under § 1983 because the organization does not qualify for such association.

The Supreme Court has held that there are two kinds of freedom of association that are constitutionally protected: intimate association and expressive association. The Court summarized these

13

two forms of associational freedom in <u>Roberts v. United States</u> <u>Jaycees</u>, 468 U.S. 609, 617-618, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984):

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

In the instant case, C2L contends that Defendants have violated their right to both intimate and expressive association. Defendants argue that C2L does not possess the right of intimate association because its membership does not resemble a family relationship as required under the Constitution. <u>See</u> <u>id.</u> Specifically, it argues that "because C2L is involved in proselytizing and expanding its membership, much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship." (Doc. 11 at 14)(<u>citing</u> <u>Bd. of Directors of Rotary Int'l v. Rotary</u> <u>Club of Duarte</u>, 481 U.S. 537, 544, 107 S. Ct. 1940, 95 L. Ed.2d 474 (1987)("<u>Duarte</u>")).

14

The right to intimate association stems from the concept of personal liberty and "reflects the realization that individuals draw much of their emotional enrichment from close ties with others." Roberts, 468 U.S. at 619. Courts have most readily afforded the right to intimate association to relationships centered around family, marriage, the raising of children, and the cohabitation among relatives. See id. These relationships are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Id. at 620

Each relationship must be scrutinized to determine where its "objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." Id.; see also Duarte, 481 U.S. at 544 ("We have not attempted to mark the precise boundaries of this type of constitutional protection. . . . Of course, we have not held that constitutional protection is restricted to relationships among family members."). Factors to be

15

considered "include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." <u>Roberts</u>, 468 U.S. at 620.

In <u>Roberts</u>, the Supreme Court considered a challenge by the United States Jaycees ("Jaycees") to Minnesota's Human Rights Act, which prohibited discrimination based on gender in places of public accommodation. At the time, regular membership in the Jaycees was limited to young men between ages 18 and 35. The Jaycees claimed that application of the Minnesota Human Rights Act violated its freedom of association. The Court held that the Jaycees was not an intimate association entitled to constitutional protection, noting that local chapters of the Jaycees were large (400 members, for example) and unselective, because "new members [were] routinely recruited and admitted with no inquiry into their backgrounds." <u>Roberts</u>, 468 U.S. at 621. The Court found chapters so unselective that "a local officer testified that he could recall no instance in which an applicant had been denied membership on any basis other than age or sex." <u>Id.</u> Finally, the Court remarked that "numerous non-members," including women, participated regularly in "a substantial portion of activities central to the decision of many members to associate with one another, including many of the organization's various community programs, awards ceremonies, and recruitment meetings." <u>Id.</u> Thus, the Court concluded, "much of the activity central to the formation and maintenance of the

association involves the participation of strangers to that relationship. Accordingly, the Court concluded that the Jaycees chapters lack the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women." Id.

In another key decision, Duarte, the Court held that California's Unruh Civil Rights Act did not violate local Rotary Clubs' freedom of association by requiring them to admit women, contrary to international club policy. The Court concluded that local Rotary Clubs were not intimate associations because: (1) despite varied size from 20 to 900, there was "no upper limit" on membership; (2) clubs focused on "inclusive, not exclusive" membership policies, and clubs were instructed to "keep a flow of [membership] prospects coming" to achieve "a true cross section of the business and professional life of the community;" (3) although membership was granted by committees, with a final decision by a club's board of directors, clubs were instructed to grant membership to "all fully qualified prospective members within [their] territor[ies]" and "maintain a membership growth pattern;" (4) many of the clubs' "central activities [were] carried on in the presence of strangers," because members of any other Rotary Club were to be admitted by the local club and members were encouraged to invite business associates and competitors to meetings; and (5) local clubs often sought news coverage or joint meetings or

activities with other organizations.  <u>Duarte</u>, 481 U.S. at 546-47.

The Court found that "[i]n sum, Rotary Clubs, rather than carrying on their activities in an atmosphere of privacy, seek to keep their 'windows and doors open to the whole world.'"  <u>Id.</u> at 547.

In contrast, in <u>Louisiana Debating & Literary Association v. City of New Orleans</u>, 42 F.3d 1483, 1498 (5th Cir. 1995), the Fifth Circuit found that four private clubs in New Orleans were intimate associations.  The clubs had a "purely social purpose" and selected members based on "character, relationships and acquaintances, congeniality, and compatibility." 42 F.3d at 1496.  The Fifth Circuit noted that (1) the clubs' admission processes were especially restrictive, because only existing members could propose new members, admission decisions were subject to vote by the general membership, and only three to five objections would preclude membership, (2) non-members were excluded from the clubs' facilities, which were not identified to the public by any signs, except for extremely limited guest policies, and (3) each club had upper limits on membership, for both residents and non-residents, with the Boston Club having the highest limits of 600 residents and 400 non-residents.

In the case at bar, the pleadings indicate that C2L is an "elite group."  (Doc. 1 at 27.)  The admission process, like that in <u>Louisiana Debating</u>, is restrictive and requires the completion of a semester-long "process of purity"; acceptance of "Jesus Christ

as Lord and Savior;" and approval of the leadership team. (Id. at 7.) Additionally, only C2L members are allowed to attend the biweekly meetings and retreats. Although the group offers services to the public and recruits other students to join, the pleadings indicate that membership itself is selective and that the inner workings of the group are insulated from the public. Moreover, the Court must construe Plaintiffs' allegations liberally at this stage. Defendants' motion to dismiss with regard to Plaintiffs' intimate association claim is, therefore, **DENIED**.

## C. Defendant Oliver

Defendants argue that Plaintiffs fail to state a valid claim against Defendant Oliver, the Director of Student Programs and Organizations, in his individual capacity. In order to sufficiently state a claim against a defendant in his individual capacity under 42 U.S.C. § 1983, a plaintiff must show a causal connection between a defendant's acts and a deprivation of a right, privilege or immunity protected by the Constitution or laws of the United States. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). Furthermore, the complaint must sufficiently allege specific facts in accordance with Federal Rule of Civil Procedure 8(e). GJR Invs., Inc . v. Coun of Escambia, Fla., 132 F .3d 1359, 1367 (11th Cir. 1998). The Eleventh Circuit has held that for a civil rights complaint to sufficiently pled:

> More than mere conclusory notice pleading is required. A
> complaint will be dismissed as insufficient where the

19

allegations it contains are vague and conclusory. Moreover, in reviewing a motion to dismiss, courts need only accept well-pleaded facts and reasonable inferences drawn from those facts. Unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal.

Gonzalez v . Reno, 325 F.3d 1228, 1235 (11th Cir. 2003)(internal quotations, alterations, and citations omitted).

In the instant case, Plaintiffs claim that Director Oliver knew of and approved of: 1) Defendant Clark's sanction of C2L; 2) Defendant Gunter's involvement when the police prohibited C2L from congregating on April 20, 2006; and 3) the final report and sanctions imposed on C2L. Read liberally, the Complaint alleges that Defendant Oliver knew of the allegedly unconstitutional acts against Plaintiffs and gave his official approval of those acts. Plaintiffs assert that, as Director of Student Programs and Organizations, Director Oliver is responsible for implementing Savannah State's policies and procedures. At present, this is sufficient to establish a causal connection. Defendants' motion to dismiss with regard to Director Oliver is **DENIED**.

V.   Quasi-Judicial Immunity

Citing to the United States Supreme Court's decision in Butz v. Economou, 438 U.S. 478, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978), Defendants argue that the Plaintiffs' claims against the individually-named hearing officer Suggs should be dismissed because Defendant Suggs is entitled to quasi-judicial immunity. However, Defendants have not cited, nor has this Court found, a

case directly on point. Therefore, it appears that the issue of judicial immunity as it applies to hearing officers in a university context is a matter of first impression.

Judges acting in their judicial function are accorded absolute immunity from suit under § 1983. See Cleavinger v. Saxner, 474 U.S. 193, 199, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985). Quasi-judicial immunity may be extended to those administrative or executive officials who perform functions closely associated with the judicial process. Id. at 200. However, the application of this absolute immunity is limited, and the proponent of a claim of absolute immunity bears the burden of establishing the justification for an application of absolute immunity. See Butz, 438 U.S. at 506-07; see also Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432, 113 S. Ct. 2167, 124 L. Ed. 2d 391 (1993). The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. See Burns v. Reed, 500 U.S. 478, 486-86, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991) (noting that the application of absolute immunity is used sparingly).

Despite this presumption in favor of qualified immunity, courts in the Eleventh Circuit have found quasi-judicial immunity in the following cases: Fuller v. Georgia State Bd. of Pardons & Paroles, 851 F.2d 1307, 1310 (11th Cir. 1990)(individual members of Georgia's Board of Pardons and Paroles); Holmes v. Crosby, 418 F.3d

21

1256, 1258-59 (11th Cir. 2005)(individual parole officer who gave testimony during a parole revocation hearing); Hicks v. Georgia State Board of Pharmacy, 553 F. Supp. 314 (N.D. Ga. 1982)(members of the Georgia State Board of Pharmacy entitled to absolute immunity from damages when the members of the Board of Pharmacy refused to reinstate the license of a former-pharmacist); Howard v. Miller, 870 F. Supp. 340 (N.D. Ga. 1994)(claims against members of Georgia's Board of Medical Examiners barred); Evans v. Georgia Peace Officer Standards and Training Council, No. Civ.A.1:05CV2579-RLV, 2006 2L 870335 (N.D. Ga. 2006)(members of the Peace Office Standards and Training Council); Property Management & Invs., Inc. v. Lewis, 752 F.2d 599, 603 (11th Cir. 1985) (corporate receiver protected executing orders of appointing judge); Finfrock v. Flint, No. 2:06-cv-230-FtM-29DNF, 2006 WL 2884953 (M.D. Fla. 2006)(docket clerk entitled to quasi-judicial immunity with regard to service of process and the entry of default judgment).

In evaluating whether an individual or an administrative body is entitled to quasi-judicial immunity, a court must determine whether the administrative body shares "enough of the characteristics of the judicial process that those who participate in such adjudications should also be immune from suit for damages." See Butz, 438 U.S. at 513.

In order to perform this analysis, the Supreme Court has articulated six factors that a court should consider when making its determination. These factors include:

(a) the need to assure that the individual can perform his functions without harassment or intimidation;

(b) the presence of safeguards that reduce the need for private damages actions as a means of controlling constitutional conduct;

(c) insulation from political influence;

(d) the importance of precedent;

(e) the adversarial nature of the process;

(f) the correctability of error on appeal.

Cleavinger, 474 U.S. at 202. No single factor is controlling. See Berkos v. Village of Wellington, No. 02-81102-Civ., 2003 WL 21383886, *2 (S.D. Fla. 2003).

In the instant case, the Court finds that Defendant Suggs is not entitled to quasi-judicial immunity. First, Defendants have not shown the presence of safeguards to protect those appearing before her. Second, Defendants have failed to show that Defendant Suggs, who Plaintiffs allege is a member of Savannah State University's faculty, is insulated from political influence. Finally, Defendant Suggs's decisions are only reviewable through the University's appeal system. Thus, Defendant Suggs's decision is only reviewable her by superiors. This does not constitute a meaningful review. Defendants' defense of qualified immunity is, therefore, **DENIED**.

VI. <u>Qualified Immunity</u>

Defendants assert that the Court should dismiss Plaintiffs' § 1983 claims because Defendants are entitled to qualified immunity. Qualified immunity shields government officials performing discretionary functions from suits in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). This doctrine ensures that before they are subjected to suit, state actors are on notice their conduct is unlawful. <u>Id.</u>, 536 U.S. at 739.

The court determines whether a defendant is entitled to qualified immunity as a matter of law, <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985), and the applicability of qualified immunity "should be resolved at the earliest possible stage of a litigation." <u>Anderson</u>, 483 U.S. 635, at 646 n.6, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). For government officials to be entitled to qualified immunity, they must show that they were acting within the scope of their discretionary authority when the alleged unconstitutional act occurred. <u>Wood v. Kesler</u>, 323 F.3d 872, 877 (11th Cir. 2003); <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002). Once government officials have established that they were acting within the scope of their discretionary authority, the burden then shifts to the plaintiff to demonstrate that Defendants are not entitled to qualified immunity. <u>Vinyard</u>, 311 F.3d at 1346. The Supreme Court

has established a two-part analysis for making this determination. Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). Viewing the facts in the light most favorable to the plaintiff, the court must first determine whether a defendant's conduct violated a constitutional right. Id. If a violation of a constitutional right is sufficiently alleged in the complaint, the court must then assess whether that right was clearly established at the time of the violation. Id.

Here, both parties agree that the acts and omissions alleged by Plaintiffs were within Defendants' discretionary authority. The burden then shifts to Plaintiffs to demonstrate that Defendants' conduct violated a constitutional right and that the right was clearly established at the time of the violation. Dalrymple, 334 F.3d at 995.[8] After a careful review of the authorities and arguments submitted by Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged the violations of clearly established rights.[9] Accordingly, Defendants' qualified immunity defense, at this stage, is **DENIED**.

---

[8] At this stage, Plaintiffs need only allege the violation of a clearly established constitutional right. Williams, 102 F.3d at 1182.

[9] Defendants counter Plaintiffs' demonstration by arguing that a review of the supplemental materials attached to Plaintiffs' Complaint shows that Defendants' actions or omissions were "religiously-neutral." However, even if the documents recount neutral reasons for Defendants' actions, Plaintiffs argue that these actions were a pretext for discrimination.

## CONCLUSION

After careful consideration and for the foregoing reasons, Defendants' Pre-Answer Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff Kinsey-Hicks's individual claims are **DISMISSED**. Likewise, Plaintiffs Norwood and Kinsey-Hicks's claims on behalf of C2L in their official capacities as President and Vice-President are **DISMISSED**. However, the claims brought by C2L and by Plaintiff Norwood in her individual capacity remain pending.

SO ORDERED, this 24th day of August, 2007.

WILLIAM T. MOORE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA